

*Emergency Motion for Temporary Restraining Order*

UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE

Frank Negus Staples, et al. Plaintiff (pro se)
v.
Kelly Ayotte, Governor of New Hampshire, et al., Defendants.

Case No. 1:24-cv-00331-LM-TSM (additional defendants to be added)

EMERGENCY MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

INTRODUCTION

Plaintiff Frank Negus Staples ("Plaintiff"), a New Hampshire citizen and declared candidate for public office as well as a party to the above-captioned civil rights lawsuit, hereby moves on an emergency basis for a Temporary Restraining Order ("TRO") and preliminary injunctive relief. Immediate judicial intervention is necessary to halt a pattern of official oppression and retaliatory harassment by New Hampshire state authorities that has escalated to an intolerable level, most recently culminating in an incident on July 14, 2025 where Plaintiff's constitutional rights were blatantly infringed by multiple state actors who were working in concert. This motion seeks narrowly tailored relief to prevent ongoing and irreparable injury to Plaintiff's First and Fourth Amendment rights – specifically, an order enjoining Defendants and their agents from engaging, surveilling, interfering with, initiating contact, or unlawfully searching or seizing Plaintiff in retaliation for his political speech and activities.

Over the past several years, Plaintiff has been subjected to a sustained campaign of surveillance, intimidation, and arrest by Defendants and their associates, all because of Plaintiff's outspoken exercise of his political voice. What began as monitoring of Plaintiff's attendance at public protests in 2020 and multiple baseless arrests in 2021 has continued unabated, even after Plaintiff obtained acquittals or dismissals of those charges. Rather than deterring Plaintiff, this pattern of official misconduct led him to file the present §§1983/1985(3) lawsuit. In response, Defendants have only redoubled their unconstitutional efforts to silence him. The July 14, 2025 incident at the State House – where state police intervened to prevent Plaintiff from peacefully delivering documents to elected officials – represents a tipping point. On that date, a New Hampshire State Trooper (Defendant Christopher Rolston, Badge #814) literally lay in wait for Plaintiff at the State House, confronted him without cause, and admitted on camera that he had advance notice of Plaintiff's visit and was "keeping an eye out" for him solely because Plaintiff supposedly "causes…problems" and "escalates" situations. No clearer evidence of viewpoint-based targeting could be imagined: by the Trooper's own account, Plaintiff was surveilled and accosted not for any criminal act, but because of who he is and what he stands for. Compounding the injury, a member of House leadership initially refused to accept

the information Plaintiff sought to deliver – explicitly rejecting it based on its source (Plaintiff) rather than its content – before relenting under pressure of demand for authorities relied upon for the initial denial and clear articulation of the rationale. This brazen act of censorship and prior restraint on Plaintiff's right to petition the government cannot be allowed to continue.

Plaintiff brings this motion to prevent irreparable harm to his constitutional rights and to ensure he can continue to engage in the political process on equal footing with other citizens. The relief requested – an order prohibiting Defendants from further surveillance, intimidation, interference, or unjustified detention of Plaintiff – merely requires Defendants to obey the law and honor rights that are already clearly established. Absent such injunctive relief, Plaintiff will remain under a shadow of state-sponsored harassment that chills his speech, deters his participation in public life, and threatens his liberty at every turn. By contrast, granting the TRO imposes no hardship on Defendants other than forbidding what is already illegal. Because Plaintiff satisfies all factors for preliminary relief – including a likelihood of success on the merits of his §1983 claims, a continuing irreparable injury to his First Amendment freedoms, and the public interest in preventing the abuse of official power – the Court should issue the TRO forthwith.

FACTUAL BACKGROUND
Plaintiff incorporates by reference the facts alleged in his First Amended Complaint (Doc. 48), and highlights the following key events demonstrating a pattern of official oppression by Defendants and those acting in concert with them:

December 28, 2020 – Newfields Candlelight Vigil: Plaintiff attended a planned and peaceful candlelight vigil in Newfields, NH (near the Governor's residence) in regards to the hidden victims of the COVID-19 lockdown measures. Law enforcement, including Defendant Kathleen O'Brien via the Newfields Police, conducted covert surveillance of attendees and, at the Governor's behest, issued baseless citations for "picketing" in a residential neighborhood. Nine participants – including a local journalist – were cited or arrested without cause. All were later found not guilty after suffering malicious trials that had no hope of success and failed accordingly, underscoring that the enforcement had no legitimate basis. This aggressive monitoring and selective prosecution of a lawful vigil introduced a pattern of targeting Plaintiff for being the organizer and other peaceful dissidents for their protected expression.

October 13, 2021 – Executive Council Meeting Mass Arrest: Plaintiff attended an Executive Council meeting at the New Hampshire Institute of Politics to oppose planned actions by Governor Sununu and the executive council, again central to COVID-19 policies. Without warning, state police (under Defendants Sununu, Formella, DeLuca, and others' direction) arrested Plaintiff and at least 8 other citizens in a sweeping action to chill the speech of anyone opposed. Plaintiff was doing nothing disruptive at the prior to or at the time of arrest – a fact later confirmed by his not guilty verdict on two separate theories of disorderly conduct, i.e. either purposely or recklessly engaged in disorderly conduct. Despite this, I prevailed following a successful 5-day, 13-hour pro se trial. This coordinated arrest (now the subject of both this case and a parallel case, Todd v. Sununu Case no. 1:24-cv-00330) exemplified viewpoint

discrimination in public forums, as those removed were identified largely by their opposition to the Governor's COVID-19 stance, Executive Orders, and related policies.

November 8, 2021 – Bail Revocation Attempt (Retaliation for Testimony): After Plaintiff was released on bail for the October arrest, he continued engaging in civic advocacy. On Nov. 8, 2021, Plaintiff peacefully testified at a public hearing at the State House – an activity squarely protected by the First Amendment. In retaliation, Defendant Charles O'Leary (Assistant Attorney General) filed a motion two days later to revoke Plaintiff's bail, falsely accusing him of violating release conditions simply for attending and speaking at the hearing, again directly related to COVID-19 policies. This motion cited Plaintiff's presence at the State House (and even his possession of a lawfully-carried work knife that passed security) as grounds to jail him. The court swiftly denied the baseless revocation attempt, but not before Plaintiff suffered extreme distress and further chilling of his willingness to attend government meetings. Indeed, the bail motion's transparent purpose was "to punish protected political expression and presence at the State House," functioning as a "chilling mechanism" to deter Plaintiff (and others) from exercising their rights of expression, petition, and civic participation, particularly regarding anything related to COVID-19 policies.

November 19, 2021 – "Bootlicking tyrants" Arrest at Fiscal Committee Meeting: Plaintiff went to observe a Fiscal Committee meeting at the Legislative Office Building in regards to the same COVID-19 funding that was rejected at the October 13th Executive Council meeting. He remained quiet and lawful throughout, despite heavy police presence specifically monitoring him. As the meeting adjourned, out in the hallway, Plaintiff verbally expressed mild frustration ("Tyrants!") upon seeing officers aggressively moving to clear the public from the hallway, particularly the way Troopers were harassing two women trying to bundle up their babies for the cold. In immediate response to that lone phrase, Defendant Trooper Gregory DeLuca (the same officer who orchestrated the October 13 arrests) seized and handcuffed Plaintiff without warning or probable cause. Again, no charges were sustained – Plaintiff was not even arraigned on any offense and prosecutor O'Leary skipped out on the trial, ultimately resulting in dismissal with prejudice. This incident further exemplifies Defendants' readiness to instantly criminalize Plaintiff's speech – even a terse political exclamation directed at police misbehavior – by means of groundless arrest.

Ongoing Surveillance and "Shadowing" of Plaintiff: In addition to these discrete incidents, Plaintiff has been continuously surveilled by state agents whenever he engages in public activism. For example, when Plaintiff attempted to attend Executive Council meetings in 2022, state troopers followed him closely, photographed him, or warned him preemptively. At times, plainclothes officers have infiltrated activist groups or online forums associated with Plaintiff, evidencing a concerted effort to monitor and manipulate his speech and associations. No evidence suggests that any of this surveillance was predicated on criminal activity; rather, it is a content- and identity-based monitoring of a political dissident. In fact, one undercover operative, namely MAJ(R) Christopher Brooks who died in a crash in his pickup truck along interstate 293 in Bedford, New Hampshire on January 23, 2022. Maj. Brooks was a close associate of Defendant Sununu, even showing Plaintiff Staples pictures of them with their arms around each other's

necks. Brooks said he was "flipping on Sununu" and repeatedly attempted to persuade Staples to "train fighters" and shoot "sniper rifles." It is Plaintiff's sincere belief that Brooks was acting as an information gatherer and contract agent to Defendant Christopher Sununu whose purpose was to manipulate and entrap Staples for a setup, on top of general information gathering on his political activity, particularly surrounding COVID-19 policy opposition. Such conduct violates not only the First Amendment but also New Hampshire's constitutional guarantees of privacy and free assembly (e.g., N.H. Const. Part I, Art. 2-B and 32).

July 14, 2025 – State House Interference of Lawful Business (The Immediate Trigger of this Motion): Most recently, on July 14, 2025, Plaintiff visited the State House in Concord to deliver briefing packets – containing legal and legislative materials – to members of the New Hampshire legislature. Plaintiff had communicated beforehand about this visit and was expected to visit the office of the Deputy House Speaker to discuss the delivery of his briefing materials. Upon arrival, however, Plaintiff encountered unexpected resistance from law enforcement. New Hampshire State Trooper Christopher Rolston (Badge #814) approached Plaintiff, from behind, inside the State House, entirely unprovoked and uninitiated by Plaintiff, and began to interrogate Plaintiff's purpose there. When Plaintiff explained he was already being served by someone, Trooper Rolston asserted "there's nobody here right now" and persisted in inserting himself into the situation. Even going so far as to enter the office to intervene in Plaintiff's lawful business. It became immediately apparent that Trooper Rolston was not on site by coincidence: under Plaintiff's questioning, he admitted that he had been informed Plaintiff "might be coming" and had been actively watching for Plaintiff's arrival. Indeed, Rolston conceded, "We were aware you were coming… just keeping an eye out like we do on everybody. All the [unintelligible]…". Plaintiff challenged that statement, noting "you don't do this for everybody," to which the Trooper replied, "No, we don't… we do it with people who… have problems, you know… [who] end up escalating a situation". In other words, Plaintiff was being treated as a presumptive threat and closely surveilled solely because of past political activity and the State's own prejudgment of him. Plaintiff told Trooper Rolston his interference was unwarranted and dismissed him, but the Trooper refused to disengage, retorting, "No, I'm not dismissed…I don't have to be". Only after Plaintiff insisted and inquired if the Trooper's body camera was running (it was not, until Plaintiff requested it) did Rolston begrudgingly step back. However, when Plaintiff met with Deputy Speaker Steven Smith moments later, Rolston hovered just outside the door, eavesdropping and pacing, an intimidating presence that was noted by Chief of Staff Aaron Goulette, who was the one already expecting and assisting Plaintiff with his purpose that day.

The reason for Plaintiff's visit that day was because the Deputy Speaker had refused to accept the materials Plaintiff was delivering once he realized they came from Plaintiff while refusing to provide an explanation for such refusal. According to the Deputy Speaker, he took one look at the packet, saw Plaintiff's name, and "rejected it" without reading a single word of the content. Plaintiff confronted this absurd censorship with the Chief of Staff: "He didn't even read the content? …He couldn't even read the executive summary here?". Only after Plaintiff objected in person did the Deputy Speaker relent and inform Plaintiff that he would review the content of the materials – "he said he'll look at it… I'll make sure he gets a copy," Mr. Goulette assured Plaintiff. Mr. Goulette further explained there were "internal policies" in the legislature that

purportedly allow officials discretion to refuse distribution of materials in legislative offices or mailboxes if those materials are not sent via U.S. mail. He promised to send Plaintiff a copy of said policies (which he later did via email on July 21, 2025). Those policies, however, are not grounded in any statute or formal rule, moreover, the information provided does not show any authority to deny Plaintiff access to the House mailboxes – they amounted to an arbitrary gatekeeping mechanism, twisted and invoked here to justify the content-based suppression of Plaintiff's message and communications with the legislature. In effect, legislative staff and state police worked in tandem on July 14 to impede Plaintiff's attempt to petition the government for redress of grievances : the police kept him under watch and psychological duress, while the legislative office attempted to censor and throw out his materials sight unseen. Plaintiff left the State House that day shaken and under a cloud of intimidation, followed (yet again) by Trooper Rolston who waited for him in the hallway as he departed – a final silent reminder that "we are watching you".

Upon completing his conversation with the Chief of Staff, Plaintiff was leaving and turned a corner, where he was confronted with an alarming and deliberate display of surveillance: State Trooper Christopher Rolston was stationed silently at the top of the stairwell, in a manner that made clear he had anticipated Plaintiff's movement and was lying in wait to further harass, surveil, and intimidate. Upon seeing Rolston lying in wait for Plaintiff at the top of the stairs, Plaintiff immediately turned around and doubled back to the other exit and swiftly made his way to the Governor's Office to lodge a verbal complaint. This was not an incidental presence. Rather, it followed a continuation of Rolston's unlawful investigation and prolonged and confrontational interaction in which Trooper Rolston had (1) admitted that he was monitoring Plaintiff due to Plaintiff's protected political activity, (2) falsely accused Plaintiff of being someone who "escalates situations," (3) turned on his body camera without any lawful justification or criminal predicate — expressly stating he does so only for "crimes," and then (4) refused to disengage when repeatedly instructed by Plaintiff to do so.

Recognizing the calculated nature of Rolston's surveillance and the risk of further escalation, Plaintiff immediately reversed direction to de-escalate the situation, avoid further contact with Rolston and proceeded instead to the Governor's Office to lodge a verbal complaint. Yet shockingly, within minutes of Plaintiff's arrival and while he was actively recounting the harassment to the Governor's aide, Trooper Rolston reappeared in the Governor's Office lobby. This reappearance — captured on video — either confirms that Rolston was continuing to follow Plaintiff in real-time without legal justification, or that he had immediately gone to the Governor's Office to report Plaintiff's prior protected interactions, thereby escalating the retaliation and showing a direct connection of his actions to the Governor's Office.

The cumulative effect of this conduct — from the baseless insinuations to the surreptitious surveillance and pursuit — created an environment of intimidation intended to deter Plaintiff from engaging in constitutionally protected advocacy. It constitutes not only harassment and official oppression, but a deliberate chilling of Plaintiff's First Amendment rights, justifying emergency injunctive relief from this Court.

These facts, all documented in videos, transcripts, and court records, establish a prima facie case of ongoing retaliation and official misconduct. Plaintiff's core political speech and lawful participation in government – attending meetings, testifying, delivering information – have been met with surveillance, false arrest, baseless prosecutions, and outright censorship. Defendants' actions have no legitimate justification; they stem only from animus toward Plaintiff's viewpoints and a desire to "send a message" to him and other activists to stay home and stay quiet. As a direct result of this campaign of harassment, Plaintiff's willingness and ability to engage in the political process have been severely chilled. For months at a time, Plaintiff has refrained from attending public hearings or visiting the State House unless absolutely necessary, fearing that any appearance will lead to another confrontation or fabricated charge. This chilling effect is precisely the irreparable injury that the First Amendment doctrine guards against.

LEGAL STANDARD

In determining whether to grant a TRO or preliminary injunction, the Court considers: (1) the movant's likelihood of success on the merits; (2) whether the movant is likely to suffer irreparable harm absent relief; (3) the balance of equities (hardship to the movant vs. hardship to the non-movant); and (4) the public interest. In the First Amendment context, likelihood of success on the merits often merges with the irreparable harm factor, because the loss of First Amendment freedoms, even for minimal periods, constitutes irreparable injury as a matter of law. Plaintiff will address each factor in turn, all of which strongly favor granting the requested TRO.

ARGUMENT

I. Plaintiff Is Highly Likely to Succeed on the Merits of His Claims

Plaintiff's underlying lawsuit alleges that Defendants have violated his rights under the U.S. and New Hampshire Constitutions through a pattern of retaliatory and discriminatory conduct. The new developments on July 14, 2025 provide additional, compelling proof of these violations:

First Amendment (Freedom of Speech, Assembly, and Petition): It is axiomatic that government officials cannot target individuals for adverse treatment based on their speech or political advocacy. Yet here, state officials have done exactly that. The retaliatory arrests of Plaintiff in 2021 for attending and speaking at public meetings were nakedly punitive and without probable cause. The bail revocation motion targeting Plaintiff for lawfully testifying at a hearing was an extreme form of retaliation that this Court can easily recognize as unconstitutional prior restraint. And on July 14, 2025, the censorship of Plaintiff's legislative packet and the trooper's preemptive strike to "keep an eye" on Plaintiff are textbook examples of content and viewpoint discrimination. Deputy Speaker Smith was willing to deprive elected representatives of information solely because it originated from Plaintiff – an act repugnant to the First Amendment's Petition Clause. Trooper Rolston admitted to selective enforcement: not everyone entering the State House gets tailed by police, only those deemed "problems" due to prior protected, lawful, and civil activity. Such differential treatment because of Plaintiff's identity and

viewpoint is presumptively unconstitutional. Moreover, after continued demands for an explanation for the censorship of Plaintiff's legislative packets, the Deputy Speaker has since fully capitulated and is now allowing said packets to be delivered as is. This shows that it was just an arbitrary and/or vindictive decision that had no basis in any legitimate rule, law, or rationale. Plaintiff's claim under 42 U.S.C. §1983 for First Amendment retaliation and viewpoint discrimination is exceptionally strong – indeed, much of the offending conduct is documented on video or in Defendants' own statements. There is also a strong likelihood of success on Plaintiff's parallel claims under Part I, Articles 22 and 32 of the New Hampshire Constitution, which similarly protect the rights to free speech, assembly, and instruction of representatives. Defendants cannot articulate any legitimate, content-neutral justification for their actions – there was no disorder to prevent on July 14, no security threat posed by Plaintiff's papers or peaceful presence. The only "threat" perceived was to the comfort of officials who did not wish to be confronted with Plaintiff's viewpoint. The First Amendment does not permit officials to convert their "undifferentiated fear or apprehension" of disturbance into a blanket stifling of political speech. Accordingly, Plaintiff is likely to prevail on the merits of these claims.

Fourth Amendment (Unreasonable Seizures) and Fourteenth Amendment (Due Process/Equal Protection): Defendants' physical seizures of Plaintiff – e.g., the October 13 and November 19, 2021 arrests, and the ongoing threat of arrest that hangs over Plaintiff whenever he appears at the State House – violate the Fourth Amendment's guarantee against unreasonable seizures. On each occasion, Plaintiff engaged in no conduct that would warrant detention or arrest; the seizures were undertaken for improper purposes (silencing dissent) and without probable cause. That pattern continues: Trooper Rolston's very presence on July 14 was an attempt to restrain Plaintiff's movement and intimidate him into leaving (a constructive seizure and prior restraint on Plaintiff's access to the legislature). When Plaintiff did not immediately yield, Rolston escalated by implying Plaintiff might "commit a crime," clearly evidenced by Rolston's veiled threat that "I have to turn it on when there's a crime committed" and then proceeding to turn on his body camera despite no crime afoot – effectively threatening arrest – until Plaintiff invoked his own right to film and repeatedly insisting the trooper withdraw from the voluntary contact that Rolston initiated. The Fourteenth Amendment is implicated both through its incorporation of these rights and via its Equal Protection and Due Process clauses. Plaintiff has been selectively targeted ("class-of-one" unequal treatment) – no other member of the public has been treated in this extraordinary way simply for participating in civic life. Such selective enforcement and harassment fail even rational-basis review, let alone heightened scrutiny applicable to classifications based on expression. Moreover, Defendants' abuse of legal processes (like false charges and groundless bail revocation motions) offends substantive due process, as it is conduct that "shocks the conscience" in a constitutional sense – using the machinery of law to punish lawful behavior. In short, Plaintiff is likely to succeed on his Fourth Amendment claims (unlawful seizure/false arrest) and Fourteenth Amendment claims (denial of equal protection and due process) because the evidence shows a relentless pattern of official misconduct devoid of legitimate justification.

State Law Claim – Official Oppression (RSA 643:1): Although the present motion is grounded in federal law for purposes of injunctive relief, the Court should note that Defendants' conduct also

violates New Hampshire's own criminal prohibition on "Official Oppression." RSA 643:1 makes it a misdemeanor for a public servant, with a purpose to benefit himself or harm another, to knowingly commit an unauthorized act purporting to be an act of his office. The systematic misuse of police authority described herein – arrests without cause, surveillance without predicate, enforcement of non-existent "policies" to deny access – falls well within the scope of official oppression. While Plaintiff cannot himself indict Defendants, the existence of this statute underscores the egregiousness of their conduct. It also provides further weight to Plaintiff's §1983 claims, since a pattern of state-law violations under color of law bolsters the inference of constitutional violations (e.g., equal protection/class-of-one and substantive due process). At trial, Plaintiff is likely not only to prove constitutional torts but also to establish per se unlawful acts under state law, reinforcing the merits of his case.

In sum, Plaintiff has amassed significant evidence – including video transcripts, court records, and Defendants' own communications – demonstrating that Defendants have engaged in a coordinated campaign to chill his speech and punish his advocacy. These actions strike at the heart of what §1983 and constitutional injunctive relief exist to redress. Because Plaintiff's likelihood of success on the merits is very high, this factor favors issuance of a TRO.

II. Absent a TRO, Plaintiff(s) Will Continue to Suffer Irreparable Harm
Plaintiff is presently suffering – and will continue to suffer – irreparable injury in the absence of injunctive relief. The harm is concrete and multifaceted:

Ongoing Chilling of First Amendment Rights: Every day that Defendants' intimidation tactics continue unchecked is another day that Plaintiff self-censors and curtails his engagement in the political process. The record already reflects that Defendants' past actions have "chilled Staples' participation in government meetings, public discourse, and civic journalism". For example, after the November 2021 bail revocation attempt, Plaintiff felt forced to stay away from the State House for fear of being jailed merely for appearing. After the July 14, 2025 incident, Plaintiff again is hesitant to return to the State House to deliver his packets which are now approved for distribution or approach his representatives – the very core of democratic petitioning – because he knows he is effectively a marked man. This chilling effect on free speech and petition is a quintessential irreparable harm. No later award of damages can compensate for the lost opportunities to speak or the ongoing suppression of Plaintiff's message in the critical months of his political candidacy. Courts uniformly recognize that the loss of First Amendment freedoms, even temporarily, constitutes irreparable injury. Here the loss is not "temporary" in any trivial sense – it has been recurrent and open-ended, as Defendants' harassment shows no sign of voluntarily abating. A TRO is needed to immediately lift the chill and allow Plaintiff to re-enter the forum of public debate without fear.

Threat of Unlawful Arrest and Physical Liberty Deprivations: The pattern of retaliation includes actual arrests and the threat of future arrests. Plaintiff has already been arrested multiple times on spurious grounds (December '20, October '21, November '21) and had to fight those charges for months, even years, considering that the December 2020 arrest is still pending an appeal in

NH Supreme Court. Each arrest not only stripped him of liberty in the moment, but also imposed onerous bail conditions (e.g., at one point barring him from coming within 1,000 feet of the Governor or Executive Council and where they may be). Those conditions themselves caused further irreparable harm by excluding Plaintiff from the political arena and effectively silencing his voice at public events. The ongoing risk is not speculative: Trooper Rolston's conduct on July 14 made plain that Plaintiff could be arrested on a hair trigger – "I have to turn [the bodycam] on for criminal offenses," he said, implying he was poised to treat any perceived slight as a crime. Indeed, earlier that day Plaintiff was told by Rolston, "We'll escort you out if need be," despite Plaintiff committing no infraction. If no injunction issues, Plaintiff reasonably fears that at the next meeting or event he attends, he may be seized and handcuffed simply for being present or uttering unpopular words (like "tyrants"). Such an arrest, even if later voided, would inflict irreparable harm: the violation of bodily autonomy, the humiliation, the temporary loss of freedom, and the subsequent chilling effect on Plaintiff's activism cannot be undone. There is no adequate remedy at law for the deprivation of one's liberty and constitutional rights by an unlawful arrest. Only an injunction can prospectively protect Plaintiff from this harm.

Emotional and Reputational Harm: Defendants' campaign has also caused Plaintiff significant emotional distress and damage to his reputation. Being labeled a dangerous agitator by government officials – and being shadowed by police as if one were a criminal – takes an immense psychological toll. Plaintiff has experienced anxiety, sleep disruption, and a constant fear of being followed or entrapped. He has had to invest in personal body cameras and other measures for self-protection and evidence-gathering, altering the way he lives daily life. Additionally, the repeated public arrests and police encounters have a stigmatizing effect: they brand Plaintiff in the eyes of others as a troublemaker or criminal, even though he has prevailed in court each time. This kind of reputational injury, tied directly to the violation of rights, is irreparable in that it cannot be fully compensated and continues to escalate with each incident. While an injunction cannot undo all past harm, it can prevent future irreparable injury by stopping the cycle of public confrontations, defamation, and character assassination under color of law.

Because Plaintiff's harm involves the abridgment of constitutional rights, loss of freedom, and injuries to dignity and democratic participation, monetary damages are inadequate and the injury is per se irreparable. Plaintiff satisfies the irreparable harm prong.

III. The Balance of Equities Strongly Favors Plaintiff

On one side of the scale, Plaintiff faces the ongoing deprivation of fundamental rights and the serious harms detailed above if an injunction is not granted. On the other hand, an injunction would simply require Defendants to refrain from unlawful conduct – a minimal "burden" since no one has a legitimate interest in engaging in unconstitutional acts. Compliance with the TRO would entail Defendants allowing Plaintiff the same liberty to speak and move about as any other citizen, and restricting themselves to lawful law-enforcement actions (i.e., not tailing or arresting Plaintiff absent cause).

The equities tip decidedly in Plaintiff's favor:

No legitimate harm to Defendants: The requested TRO does not impede any valid governmental function. Defendants remain free to enforce the law impartially and respond to any genuine criminal behavior by Plaintiff (which has never occurred). The order would not, for example, bar Defendants from maintaining general security at the State House or investigating actual threats. It would only forbid targeted surveillance and interference aimed at Plaintiff in the absence of wrongdoing, as well as any form of retaliation for his protected activities. There is no harm to Defendants in being required to follow the Constitution – indeed, the State of New Hampshire presumably wants its officers to do exactly that. If Defendants argue that an injunction would hamper their ability to "keep order," such an argument rings hollow, given that their actions have been directed at suppressing orderly political expression. In short, Defendants suffer no cognizable injury by ceasing practices that are unlawful and by allowing a private citizen to exercise his rights freely.

Severe harm to Plaintiff without relief: By contrast, the absence of an injunction leaves Plaintiff vulnerable to the next incident of oppression. With election season and legislative sessions ongoing, Plaintiff will have cause to be at the State House and other political venues regularly. Each occasion presents an opportunity for Defendants to repeat their unconstitutional conduct – whether that's having troopers trail him, barring him from entering a public meeting, or orchestrating another pretextual arrest to "teach him a lesson." The harm from even one more such incident could be devastating, perhaps far worse than before: for instance, if physically arrested again, Plaintiff could face bail revoked or conditions re-imposed that ban him from all government properties, effectively exiling him from the democratic process. The balance of hardships isn't close: one side risks ongoing oppression of core civil rights, the other side merely loses the license to oppress. Equity cannot countenance the latter.

IV. An Injunction Serves the Public Interest

The public interest is overwhelmingly in favor of protecting constitutional rights and preventing abuses of government power. As the First Circuit has noted, the public has a strong interest in the "vindication of an individual's constitutional rights and the enforcement of the law". Here:

Enjoining Defendants' misconduct will affirm the fundamental principle that no government official is above the law and that our democracy tolerates no retaliation against citizens for attempting to access or criticizing the government. This message serves not just Plaintiff, but all citizens of New Hampshire who have the right to speak truth to power without fear. The public interest is always served by ensuring that the First Amendment is upheld, especially in the context of political speech and petitioning activity at the seat of government.

Conversely, denying relief would send a chilling message to the community: that those in power may target and harass their critics with impunity. It would discourage other citizens from participating in governance (the "chilling effect" extends beyond Plaintiff to anyone who

observes his treatment). That outcome is distinctly against the public interest, which lies in robust debate, free flow of information to elected officials, and accountability of public servants (all values enshrined in Part I, Article 8 of the NH Constitution).

Additionally, the public has an interest in the integrity of law enforcement. By granting an injunction, the Court will help restore proper boundaries on the State's policing practices, reminding law enforcement that their duty is to protect public safety, not to act as a political enforcer for those in power. This improves trust in law enforcement for the broader community. It also aligns with the legislative intent behind statutes like RSA 643:1 (Official Oppression), which reflect the public's interest in deterring officials from misusing authority.


In sum, a TRO in this case carries significant public benefit: it upholds constitutional norms, protects the free participation in government of not only Plaintiff but all citizens, and reinforces the rule of law in New Hampshire governance. These interests far outweigh any claimed administrative inconvenience to Defendants.

V. No Security Bond Should Be Required
Federal Rule of Civil Procedure 65(c) permits the Court to require a security bond for issuance of a TRO. However, given Plaintiff's pro se status, limited financial resources, and the strong public interest at stake, Plaintiff respectfully requests that the bond requirement be waived or set at a nominal amount. This Court has discretion to waive the bond in public-interest civil rights cases. Requiring a substantial bond would effectively deny Plaintiff access to injunctive relief and thereby reward Defendants for their misconduct. Defendants suffer no monetary damages from a TRO that merely orders them to obey the law, so no security is needed.

RELIEF REQUESTED

For the foregoing reasons, Plaintiff respectfully requests that this Honorable Court issue an Order granting the following relief:

1. Temporary Restraining Order: Immediately restraining and enjoining Defendants, their officers, agents, employees, and all persons in active concert with them from engaging in any of the following conduct with respect to Plaintiff:

a. Surveillance, monitoring, or "shadowing" of Plaintiff that is not part of a lawful investigation of actual suspected criminal activity. This includes prohibiting the maintenance of any watch list, special alert, or ad hoc directive that targets Plaintiff's movements or presence at public locations solely due to his identity or past expressive activities. In practical terms, if Plaintiff enters a public building or attends a public event, Defendants shall not dispatch officers to tail or film him unless they have individualized reasonable suspicion that Plaintiff is presently involved in criminal wrongdoing. Generalized "intelligence" operations directed at Plaintiff's political or advocacy activities must cease forthwith.

b. Interfering with or obstructing Plaintiff's access to public forums, government meetings, or communication with public officials in the absence of a valid time, place, and manner restriction that is narrowly tailored and equally applied to all. Defendants must allow Plaintiff the same opportunity to speak at hearings, deliver materials to legislative offices, attend press conferences, or otherwise engage with his government as any other citizen. They shall not bar or discourage any state official from receiving Plaintiff's petitions or correspondence based on Plaintiff's identity. Any trespass notices, de facto bans, or special conditions previously imposed on Plaintiff's entry into public buildings (such as the State House or Legislative Office Building or Courthouse) are to be suspended pending further order of the Court. Plaintiff must be treated as a welcome member of the public, not as a persona non grata.

c. Detaining, arresting, searching, or seizing Plaintiff's person or property without a warrant or probable cause of a crime. Defendants are enjoined from effecting any arrest of Plaintiff for disorderly conduct, trespass, resisting, or similar catch-all offenses as a pretext to suppress his speech. Any law enforcement engagement with Plaintiff must be predicated on the same objective criteria and standards that would apply to any other individual. The Court's order would thus prohibit the kind of arbitrary, retaliatory arrest Plaintiff suffered on November 19, 2021 (for saying a single word of criticism) and the threatened arrest implied on July 14, 2025. Additionally, Defendants shall not confiscate or destroy any flyers, documents, recording devices, or other materials lawfully possessed by Plaintiff in the course of his political activity, absent a legitimate evidentiary basis. In short, no more fabricated charges, no more rough expulsions, no more silencing-by-handcuffs – unless Plaintiff truly commits an arrestable offense (at which point, of course, Defendants may act, and Plaintiff will abide by the law like anyone else).

2. Order to Show Cause for Preliminary Injunction: Setting a prompt hearing at which Defendants must show cause why the TRO should not be converted into a preliminary injunction pending final judgment. At that hearing, Plaintiff intends to seek continuation of the above restraints for the life of the case, as well as consideration of additional relief (such as no-contact orders against specific troopers who have harassed Plaintiff). The TRO relief requested herein is narrow and immediate; Plaintiff reserves the right to request broader injunctive relief as the case progresses (for example, policy changes or training requirements to ensure this pattern does not recur with others).

3. Any other and further relief that the Court deems just and proper to effectuate the purposes of the TRO. This may include expedited discovery or court-ordered mediation to address underlying issues. Plaintiff leaves the fashioning of relief to the Court's sound discretion but emphasizes the urgent need for interim protection in the meantime.

CONCLUSION

Plaintiff Staples never wanted to be in court fighting his own government. He is a businessman, a community volunteer, and now a candidate for office, who sincerely believed in the principles of open government and civil liberty. Unfortunately, the actions of those in power – documented in detail above – have left him no choice but to seek the Court's protection. The evidence shows a clear pattern of ongoing unconstitutional conduct that, if not enjoined, will cause Plaintiff and the fabric of public discourse irreparable damage. Conversely, stopping these abuses now will reinforce the rule of law and send a powerful message that this Court will not allow "official oppression" to masquerade as law enforcement.

For all the reasons stated, Plaintiff respectfully asks that the Court grant the Emergency Motion and issue a Temporary Restraining Order as specified. By doing so, the Court will vindicate bedrock constitutional rights and prevent further harm while this case is litigated to its ultimate conclusion.

Respectfully submitted,

Frank Negus Staples – Plaintiff, pro se
332 Merrimack Street
Manchester, NH 03103
Phone: 603-722-5408
Email: Absolutedefiance@protonmail.com

Dated: July 22, 2025

CERTIFICATE OF SERVICE: I, Frank Negus Staples, hereby certify that a copy of the foregoing motion (and any supporting documents) will be served upon all Defendants or their counsel by electronic filing via CM/ECF (for those who have appeared in this case) and by email and/or U.S. Mail for any Defendants who have not yet appeared, on this 22st day of July, 2025.